IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

CAMERON ARNOLD, ET AL

NO. 4:25-CR-259-P

**GOVERNMENT'S RESPONSE TO
MOTIONS FOR ACQUITTAL AND NEW TRIAL**

The government opposes the defendants' motions (Docs. ## 372, 373, 374, 376, 377, 378, 379, 380, 382, & 383) for an acquittal under Rule 29, and for a new trial under Rule 33. Their motions are attempts to get this Court to act as "the thirteenth juror," to second guess the jury's verdict under the guise of legal and factual insufficiency. Their motions also fail to show any error occurred at trial that would be a miscarriage of justice to let the jury's verdict stand.

**I.    DEFENDANTS' MOTIONS FOR AN ACQUITTAL UNDER RULE 29**

**A.    LEGAL STANDARD**

Under Rule 29(c) of the Federal Rules of Criminal Procedure, a defendant may move for a judgment of acquittal within 14 days of a jury's guilty verdict. "A motion for acquittal should be granted if the government fails to present evidence sufficient for a reasonable jury to have found that each essential element of the offense was established beyond a reasonable doubt." *United States v. Vasquez*, 677 F.3d 685, 692 (5th Cir. 2012). The Court is required to consider "the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in the

**Government's Response to Motions for Acquittal and New Trial – Page 1**

government's favor." The jury "may choose among reasonable constructions of the evidence: The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Santillana*, 604 F.3d 192, 195 (5th Cir. 2010). As the Supreme Court remarked long ago, "circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Coggeshall v. United States (The Slavers)*, 69 U.S. (2 Wall.) 383, 17 L. Ed. 911, 914-15 (1865). The Court should recognize "that it is the sole province of the trier of fact to weigh the evidence and the credibility of the witnesses." *United States v. Martin*, 790 F.2d 1215, 1219 (5th Cir.1986) (internal marks omitted). And the jury "may properly use their common sense and evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings." *Ayala*, 887 F.2d at 67 (internal marks omitted).

### B.    ANALYSIS

All the defendants have asked the Court to set aside the jury's verdict, arguing the evidence was legally and factually insufficient to convict each of them. On the contrary, the overwhelming evidence the government presented at trial easily established the defendants' guilt in accordance with the jury's verdict. Over a nearly three-week trial, the government presented around 60 witnesses and more than 200 exhibits. The evidence consisted of surveillance video from the Prairieland Detention Center (PDC) showing 13 people dressed in all black shooting fireworks at the facility, spray painting pejoratives on the facility and employees' cars, damaging the property of the facility, and shooting at the

Alvarado police officer who was responding to the PDC 911 call for assistance. It showed the defendants knowingly and illegally trespassing on PDC property, and knowingly and illegally shooting fireworks at the facility to riot and cause an uprising amongst the detainees inside. They were all dressed in "black bloc" to hide their identities not only from law enforcement, but even from each other, as was explained from the testimony of Seth Sikes and Nathan Baumann. The surveillance footage caught the defendants at and near Song at the time he opened fire and shot the Alvarado police officer. And the surveillance footage, together with Sikes's and Baumann's testimony, caught Baumann and Evetts vandalizing and damaging cars and PDC property, including tearing down a surveillance camera.

The evidence included dash- and body-camera footage from many of the law enforcement officers who arrived on scene shortly after the incident, which caught most of the defendants trying to flee the scene. The officers found many of the defendants had brought trauma individual first aid kits (IFAKs), which were designed to address serious injuries such as a gunshot wound. They had brought firearms, including AR-platform firearms, body armor, and handheld radios for communication.

The evidence also included DNA and fingerprint evidence that coupled with cooperator testimony and the ATF Forms 4473, established Song was the person who shot the Alvarado police officer within seconds of his arrival. The ATF Forms 4473 also linked Song to many of the firearms seized in this case.

The evidence included cell-tower analysis showing the defendants had either turned off their phones at the PDC, placed them in a Faraday bag, or left the phone at the 56 Street residence, where many of them staged before driving to the PDC. Morris's cell phone was found in a Faraday bag along with Joy Gibson's phone, which was found where Song had shot the police officer. The cell-tower analysis also showed that in less than 24 hours after the July 4 attack and Rueda's arrest, Sanchez went to Rueda's Fort Worth home and spent nearly seven hours there. The government presented evidence from search warrants from many of the defendants' residences showing much of the same materials were possessed and shared amongst them, but Rueda's house, which was searched after Sanchez had been there for nearly seven hours, had only one "zine."

The evidence also showed that less than 48 hours after the attack on the PDC and Rueda's arrest, Sanchez spoke with Rueda over the phone. This phone call clearly established that Sanchez was well aware of what occurred at the PDC, Rueda's involvement and arrest, her charges, the FBI's involvement in the case, and the need to hide evidence and get her Jeep towed from where it was parked at the 56 Street residence, as that was where most of the defendants staged before going to the PDC on July 4. Less than 12 hours after the attack and many of the defendants' arrests (including Rueda), text messages showed various conspirators trying to assist those who had been arrested. This included text messages with "Kels," who Rueda had mentioned in her jail phone call with her mother, and "Kels" mentioning "Kris" as someone who could also help. The text messages also showed Sanchez already working with others to get Rueda's Jeep from the 56 Street residence.

**Government's Response to Motions for Acquittal and New Trial – Page 4**

Less than 48 hours after the attack on the PDC and Rueda's arrest, the evidence showed Sanchez moving a box of materials to an apartment in Denton. This apartment was the residence of "Kels" and "Kris." The government showed that there were items in the box that were the same items found in the Soto's residence, tying Sanchez and Rueda to the Sotos, and similar items found amongst the other defendants. It also showed materials in the box contained handwritten notes on them, specifically the name "Ines," and "Ines in bc" [Ines in book club]. This further drew the connection between Sanchez, Rueda, and the Sotos. This connection was important for purposes of *Pinkerton* liability and showing they all shared the same motive, intent, knowledge, and foreseeability. Sanchez's actions and his demeanor and evasiveness on the dash-camera footage when he was detained shortly after dropping off the box at the Denton apartment proved Sanchez knew the box contained important evidence against Rueda.

The evidence also included numerous text messages amongst some of the defendants discussing the planning of the July 4 attack at the PDC. Rueda and Evetts had attended the morning peaceful protest, which also provided a sharp contrast to the defendants' conduct on the night of July 4. They sent numerous text messages to others in a July 4 chat group that clearly showed they were scouting the PDC and neighborhood and providing reconnaissance. Evetts noted how long it took for a gate fence to open and shut. Rueda noted ring cameras from a neighboring home, among other things. The group discussed the PDC property line, the legality of fireworks in the Alvarado city limits, and the bringing of firearms.

The evidence showed Evetts took cash out the morning of July 4 and text messages showed he purchased the fireworks used in the attack. Sikes's testimony established the fireworks were brought in a red cooler that came out of Morris's minivan, and Evetts carried the cooler up Tanglewood Drive to the PDC.  Morris drove several of the defendants from the 56 Street residence where they staged prior to going to the PDC. The evidence showed Morris had a handheld radio in the van, which was on and tuned to the same frequency as a handheld radio found on or near the PDC grounds. And although Morris may have initially stayed in the van, the evidence showed Morris would leave the van and join the others at the PDC after radioing in that he saw three people walking towards the PDC. Morris would receive word back over the radio that these three people, which the evidence showed were the Sotos and Batten, were "friendlies." The surveillance footage further corroborated this as it showed the Soto's vehicle drive around the neighborhood adjacent to the PDC several times before they finally park and walk to the facility.  The evidence would also show that the Sotos and Batten would shut off their phones, with some of them leaving their phones in the car. The fact that all the defendants either left their phones at another location, shut them off, or placed in a Faraday bag was evidence of the extreme operational security measures ("opsec") all the defendants took to hide their identity, hide their planning, and hide their involvement in the PDC attack.

Finally, all the Antifa, Emma Goldman Book Club, Socialist Rifle Association, and other anti-ICE, anti-government, and anti-law enforcement propaganda and materials was strong evidence of all the defendants' motive, intent, knowledge, connection to one

another, conspiratorial conduct, and foreseeability of all the actions taken that night. These materials contained the exact same tactics and "opsec" this very group of defendants employed in this case, dressing in "black bloc"; using handheld radios, fireworks, and encrypted messaging applications; destroying government property; and possessing trauma IFAKs, firearms, and body armor.  They used the same encrypted text messaging application discussed in the materials. Items found in the box Sanchez tried to hide at the Denton apartment contained materials describing the same kind of attack on the PDC, including dressing in black bloc, destroying surveillance cameras at a prison, and shooting fireworks at the prison. This evidence was crucial to tie all the defendants together and establish their liability both substantively and through *Pinkerton*.

The government presented expert testimony from an ATF agent that established the mortar fireworks the defendants shot at the facility were explosives within the meaning of section 844. *See also United States v. Dugger*, 2023 U.S. App. LEXIS 11946, 2023 WL 3479571 (9th Cir. 2023) (reversing restitution order but affirming sentence of defendant who threw a firework into a Starbucks in violation of 18 U.S.C. § 844(f)). And the government presented expert testimony on Antifa, anarchists, and anarch-communist groups, explaining their tactics, organization, and planning.

Taken together, the government presented overwhelming evidence establishing the defendants' guilt beyond a reasonable doubt, both substantively and though *Pinkerton*. The jury's verdict is rational, based on the evidence, and in accord with the Court's instructions to them. Thus, the Court should decline the defendants' invitation to play "thirteenth juror" and second guess the jury's verdict.

## II.    DEFENDANTS' MOTIONS FOR A NEW TRIAL UNDER RULE 33

### A.    LEGAL STANDARD

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court "may vacate any judgment and grant a new trial if the interests of justice so require."  The interest-of-justice standard "'requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of the trial.'"  *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004) (quoting *United States v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988)).  "Although the district court has broad discretion to decide a Rule 33 motion, the court may not grant the motion unless the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand." *United States v. Fuchs*, 467 F.3d 889, 910 (5th Cir. 2006).

Thus, "motions for new trial **are disfavored** and **must be reviewed with great caution**." *United States v. Eghobor*, 812 F.3d 352, 363 (5th Cir. 2015) (internal quotes and citations omitted) (emphasis added); *United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016) ("We have stressed that motions for new trial are generally disfavored . . . ."); *United States v. Sipe*, 388 F.3d 471, 493 (5th Cir. 2004) ("the power to grant a new trial . . . **should be invoked only in exceptional cases**") (emphasis added).  The Court "should not grant a motion for new trial **unless there would be a miscarriage of justice, or the weight of evidence preponderates against the verdict**." *Wall*, 389 F.3d at 466 (emphasis added.)  This may be based on the Court's "**evaluation of witnesses and weighing of the evidence**." *Wall*, 389 F.3d at 465. (emphasis added).

Accordingly, the Court should not grant a new trial unless the defendants establish they suffered "adverse effects" on their "substantial rights." *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997) (internal marks omitted). "Otherwise, it would be impossible to give any meaning to the concept of miscarriage of justice." *Wall*, 389 F.3d at 468 (internal marks omitted).

**B.    ANALYSIS**

    **1.    The Court did not err and there was no manifest injustice in admitting the Antifa, Emma Goldman Book Club, Socialist Rifle Association, and other anti-ICE, anti-government, and anti-law enforcement propaganda and materials because it was highly probative evidence establishing the defendants' motive, intent, knowledge, connection to one another, conspiratorial conduct, and foreseeability.**

Rueda complains the government "introduced extensive evidence regarding 'Antifa,'" and "generalized alleged ideology, historical materials, literature, and an expert whose testimony framed Antifa as a dangerous movement." (Doc. #376 at 13.) She contends this evidence "was not tied to any specific conduct by" Rueda; she contends this evidence was "designed to evoke fear, political bias, and guilt by association"; and she contends this evidence "had minimal, if any, probative value" and, instead, "served to paint the defendants as members of a broader, disfavored ideological group." (*Id.*) Thus, she argues the Court should have excluded this evidence under Federal Rule of Evidence 403 and she should receive a new trial.

"Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979). Rule 403's "function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* Its purpose is not "to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *Id.* Thus, "the application of Rule 403 must be **cautious and sparing**." *Id.* (Emphasis added.)

As discussed above, the evidence Rueda complains of was highly relevant and probative to proving her motive, knowledge, intent, conspirator association with the other defendants, and the reasonable foreseeability of the conduct of the other defendants on July 4, 2025. The government presented that evidence in that context and argued its purpose in that context in its closing arguments. Moreover, the Court specifically instructed the jury on the following:

> The First Amendment to the Constitution guarantees to all persons in the United States the right to freedom of speech, freedom of religion, and freedom of association. **Because of these constitutional guarantees, no one can be convicted of a crime simply on the basis of his beliefs, his expression of those beliefs, or his associations**. The First Amendment, however, does not provide a defense to a criminal charge simply because a person uses his associations, beliefs, or words to carry out an illegal activity. **Constitutionally protected speech can be properly used as evidence to prove a defendant's motive, intent, and knowledge to commit the offense or further the unlawful purpose of any jointly undertaken criminal activity**.

> Stated another way, if a defendant's speech, expression, or associations were made with the intent to knowingly provide material support or resources to be used to prepare for or carry out a violation of federal law, or to carry out the concealment of an escape from such violation, as described in the Second Superseding Indictment, then the First Amendment would not provide a defense to that conduct.

(Doc. #366 at 14.) (Emphasis added.) The Court did not err in allowing the government to present this evidence in that proper context and, coupled with the Court's instruction to the jury, Rueda fails to show the jury convicted her "not based on what [she] did but based on what the government suggested she represented." (Doc. #376 at 14.)

The jury also saw evidence of Rueda's attendance at the daytime protest for purposes of scouting the PDC and providing reconnaissance to the other defendants. And the jury saw evidence of Rueda's text messages with others in the planning of the attack on the PDC. Thus, Rueda fails to show the jury convicted her based on her beliefs and not her conduct. Accordingly, Rueda also fails to show this is an exceptional case where a miscarriage of justice would result unless the Court granted a new trial.

### 2. Batten's claim of jury misconduct rests on pure speculation and her request to have the Court conduct a hearing would violate Rule 606(b)(1).

Batten argues she is entitled to a new trial based on "juror misconduct and irregularities during deliberations," which she contends "compromised the integrity of the verdict and deprived her of a fair trial." (Doc. #383 at 11.) Batten contends that members of the public waiting outside the courtroom on the fourth floor during deliberations "heard a loud and sustained disturbance emanating from the area of the jury room shortly after deliberations resumed following a lunch break." (*Id.*) Batten contends these

members of the public heard "multiple individuals shouting simultaneously for approximately one-to-two minutes in an otherwise quiet courthouse setting." (*Id.*) From that, batten speculates "there is reason to believe that jurors engaged in a heated confrontation inside the jury room and that certain jurors may have been subjected to intimidation or coercion during deliberations." (*Id.* at 12.)

Citing various Supreme Court and Fifth Circuit caselaw, Batten contends this Court is required to conduct a hearing on whether jury misconduct occurred in which all parties are permitted to participate.  But every case she cites involved instances of jury tampering, or an outside influence on the jury.  When the alleged misconduct is internal, such as one or more of the jurors may have violated the court's instructions, whether to hold a hearing rests in the sound discretion of the Court. *See United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984) ("we have distinguished between jury panels tainted by outside influence, such as publicity or direct appeals from third parties, and panels on which one or more of the jurors themselves have violated an instruction of the court"). As there is no allegation of any jury tampering or any outside influence on the jury, the Court is not required to hold a hearing in which all the parties are allowed to participate.

Nonetheless, Batten has failed to even allege misconduct on the part of any of the jurors. All she alleges is that members of the public may have overheard certain jurors arguing or getting into a heated argument during deliberations. She then speculates of "possible intimidation" and "whether one or more jurors were coerced into abandoning their honest convictions." (Doc. #383 at 14.)

This, of course, is belied by Court's individual polling of each juror after reading the verdict. Every juror indicated that it was his or her verdict and none reported being coerced or intimidated into abandoning their honest convictions.  And overhearing a heated argument among the jury during deliberations is insufficient to establish a claim of misconduct.

Finally, as what has been reported is an alleged incident that occurred during the jury's deliberations, it would be inappropriate for the Court to conduct such a hearing. *See* Fed.R.Evid. 606(b)(1).  Under Rule 606(b)(1):

> During an inquiry into the validity of a verdict or indictment, **a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment**. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(Emphasis added.) Rule 606 "permits juror testimony about whether 'extraneous prejudicial information was improperly brought to the jury's attention,' 'an outside influence was improperly brought to bear on any juror,' or 'a mistake was made in entering the verdict on the verdict form.'" *United States v. Scott*, 576 Fed. Appx. 409, 413 (5th Cir. 2014), quoting Fed.R.Evid. 606(b)(2). Thus, any inquiry would violate Rule 606(b)(1). *Scott*, 576 Fed. Appx. at 413 (hearing exploring "the mental processes concerning the verdict" is inappropriate).

        **3.**      **The Court should decline the defendants' request to play the role of thirteenth juror, substitute its judgment for that of the jury, reweigh the evidence and witness credibility, and overturn the jury's verdict.**

The defendants ask the Court to independently reassess the weight of the evidence against them and reassess the credibility of the witnesses who testified against them and grant them a new trial under Rule 33, finding the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.

As mentioned above, motions for a new trial are disfavored, must be reviewed with great caution, and should be granted only in exceptional cases. And though the Court enjoys "broad discretion" in deciding a motion for a new trial under Rule 33, the Court's discretion "is not limitless." *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir. 2005). The Court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.*; *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997)("**it is not the role of the judge to sit as a thirteenth member of the jury**") (emphasis added).

The defendants here are clearly asking the Court to simply reweigh the evidence, overrule the jury's credibility determinations, and determine that another result is more reasonable (actually preferable to them). As the Court witnessed and as discussed above, the government produced overwhelming evidence that supports the jury's verdict in this case. This evidence consisted of various video and audio evidence, cell-tower analysis, DNA evidence, fingerprint evidence, physical evidence from the scene, text messages between many of the defendants, evidence seized from their homes and cell phones, and expert testimony. There was more than ample evidence for a rational juror to convict the defendants in the manner the jury did, and as the Fifth Circuit cautioned, the Court should not now play the role of juror and set aside the verdict.

**Government's Response to Motions for Acquittal and New Trial – Page 14**

## III.    CONCLUSION

Accordingly, because the defendants fail to show the verdict is not supported by the evidence and fail to show any error that has resulted in a miscarriage of justice, the Court should deny their motions for a directed verdict and a new trial and let the jury's verdict stand.

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

*s/ Frank L. Gatto*
FRANK L. GATTO
Assistant United States Attorney
Texas Bar No. 24062396
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone: 817.252.5213
Facsimile: 817.252.5514
E-mail: Frank.Gatto@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2026, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

*s/ Frank L. Gatto*
FRANK L. GATTO
Assistant United States Attorney